## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MITCHELL STERLING WILLIAMS, | : | |
| Petitioner, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | No. 04-5619 |
| MARYLIN BROOKS, et al., | : | |
| Respondents. | : | |

## MEMORANDUM AND ORDER

Brody, J.                                                                                 June   7,  2006

Petitioner Mitchell Sterling Williams ("Williams") petitions this court for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254.  I referred the petition to the magistrate for a Report

and Recommendation ("R&R") in accordance with 28 U.S.C. § 636(b)(1)(B).  The magistrate's

R&R recommends that I deny the petition.  Petitioner filed timely objections.  I agree with the

magistrate's recommendation to deny the petition.  I write separately, however, because I do not

find untimeliness to bar Williams's claims, find two of them procedurally defaulted on different

grounds, and reject the third on the merits.


## I.        Facts and Procedural History

On May 9, 1997, a jury convicted Williams of second-degree murder, burglary, and

possessing an instrument of crime.  (Verdict Sheet 5/9/97.)   The charges arose from the February

8, 1996 death of Helecia Whittle ("Whittle"), Williams's former girlfriend, who died from

injuries sustained in a fall from her fourth floor balcony.

Whittle's sister Anessia Whittle ("Anessia") testified for the prosecution.  She was

1

Dockets.Justia.com

staying with Whittle the week of her death, because Whittle "was afraid of [Williams], she didn't want to be home alone." (Tr. 5/6/97 at 74.) The sisters were in Whittle's apartment together the night of February 8, 1996. Anessia testified that Whittle received two phone calls from Williams that night, asking if anyone was with her, and Whittle told him nobody was there. (Id. at 77-78.) Anessia testified that after she and Whittle fell asleep, they were awakened by noise in the kitchen. When Anessia went to get something to drink from the kitchen, she saw an arm coming through the window, and told Williams "Don't come in." (Tr. at 79.) She testified that neither she nor Whittle ever gave Williams permission to be in the apartment that night. (Id. at 89.)

Anessia testified that after she told Williams not to come in, she and her sister sat in the bedroom and heard a knocking on the wall, and then again heard noise at the kitchen window. (Id. at 80-81.) Anessia followed Whittle to the kitchen, where she saw Williams at the sink and Whittle telling him to get out of the apartment. (Id. at 82.) Anessia testified that Williams asked Whittle again who was in her apartment, and when Whittle said her sister was there, Williams turned and moved toward Anessia holding a two-pronged fork at her eye level. (Id. at 82.) At that point, Whittle went out onto the balcony, and Williams ran after her. Anessia saw them "in a real tight bundle" with Whittle leaning against the metal railing on the balcony, and she heard Whittle say "No, no." (Id. at 84-85.) Anessia testified that because she was having trouble dialing 911, she ran into the hallway of the apartment building for help, and as she walked back toward the balcony, she "hear[d] a thump." (Id. at 86.) She testified that she saw Williams flee down the stairs. (Id.)

Medway cross-examined Anessia, eliciting that Williams had lived with Whittle in the apartment from around Thanksgiving until just before January, 1996. (Id. at 92.) On cross-

2

examination, Anessia said that the second time she went into the kitchen, Williams "had a foot and an arm inside that apartment" and Whittle was "literally trying to get him out" by pushing him back out the window  (Id. at 103-04.)  Anessia testified that when Williams came into the kitchen window, she did not see anything in his hands.  She also said that she had never seen the two-pronged fork before and it was definitely not Whittle's.  (Id. at 119-120.)  She did not see Williams strike Whittle.  (Id. at 137.)  She did not see the fork in his hands after he approached her with it in the kitchen.  (Id. at 148.)

Criminal Evidence Specialist Richard Henderson testified about the crime scene.  (Tr. 5/6/97 at 18-69.)  On direct examination by the prosecution, he showed the jury photos of two red stains on the stairwell at the second floor.  (Id. at 36-37.)  He testified that samples of the blood were submitted to the crime lab for blood typing, but the amount was insufficient to determine type.  (Id. at 45.)  Dr. Edwin Lieberman, Assistant Medical Examiner, testified about Whittle's autopsy.[1]  (Tr. 5/7/97 at 46-58.)  He testified that when he performed the autopsy, he found "numerous blunt force injuries, as well as several paired puncture wounds."  (Id. at 48.)  There were three pairs of puncture wounds on or near her left shoulder, one set one-half inch deep, one set five-eighths inch deep, and one set one and a quarter inches deep.  (Id. at 49-51.)  Dr. Lieberman testified that the force of the puncture wounds could have caused Whittle to tumble over the balcony railing, and his opinion to a reasonable degree of medical certainty was that the cause of her death was homicide.  (Id. at 57-58.)

After Medway called five witnesses at trial who testified about Williams's good

---

[1] The prosecution also called a few other witnesses, but their testimony is not included in this account because it is not relevant to Williams's claims in his petition for habeas relief.

3

reputation for being "a peaceable, truthful, honest and law-abiding citizen"[2]  (Tr. 5/8/97 at 5-19),

Williams took the stand.  He testified that his relationship with Whittle did not end until the first

week in February 1996, and that he lived with her from November 1995 until then.  (Id. at 21-

22.)  Williams said that he called Whittle on the evening of February 8, 1996, and made plans

with her to drop off the key he still had to the front door of her apartment building and to talk

about when he could pick up his bed.  (Id. at 26-27.)  He was working an evening shift, so he

arrived at her building between 12:30 and 1:00 a.m.  (Id. at 27.)  Williams testified that he used

the key to the building's front door, but when he knocked on the door of Whittle's apartment, he

received no answer.  (Id. at 28.)

At that point, Williams testified, he went around to the kitchen window, knocked, opened

the window, stuck his head in, and yelled that he had come to give her the key.  (Id.)  He testified

that when he started to go through the window, Whittle stabbed him in the leg.  (Id. at 29.)

Williams stated that he heard Whittle say "Don't come in here," and he told her "it was me,

Mitchell."  (Id.)  After Whittle stabbed him, Williams came through the window and they

"wrestled and tussled" before she ran to the balcony.  (Id. at 30.)  Medway questioned him on

what happened next:

Q.    And when she ran away from you, what did you do?

A.    I followed behind her and asked her, as I came to her in the hallway, why did she stab me,
and as I came toward her, she said "No, no," and went backward; as she went backwards,
she went over to the balcony and fell off the railing.

(Id. at 32.)  Williams also gave his explanation of the puncture wounds:

---

[2] The witnesses were Williams's neighbor Katie Googe, his friend since childhood
Ronald Dixon, his mother's friend Delores C. Stanton, his friend and god sister Delores M.
Stanton, and his neighbor Helen Cheeks.

Q.      Where did the stabbing take place?

A.      Inside the apartment, in the kitchen.

Q.      Were you trying to injure her in any way when you stabbed her?

A.      No.

Q.      Why is it that you stabbed her?

A.      Well, when she stabbed me in my leg, my anger over aggressive me [sic], and I tried to

        protect myself, so I grabbed the first thing I felt, and I used it.

Q.      Okay.  So, you were hurt and angered by being stabbed; is that correct?

A.      Yes, Sir.

Q.      Okay.  Did you push her over the balcony?

A.      No, Sir.

Q.      Did you want her to go over the balcony?

A.      No, Sir.

Q.      Did you want to kill her?

A.      No, Sir.

(Id. at 33-34.)  Williams testified that he was eight or ten feet away from Whittle when she fell

over the balcony.  (Id. at 36.)  Williams also denied approaching Anessia with the two-pronged

fork.  (Id. at 34.)  He said that he had seen the fork before in the apartment and it was not his.

(Id. at 45-46.)

        Williams testified that his friend was waiting for him in the friend's car, and Williams

told him that he "had a little fight, little quarrel."  (Id. at 40.)  Williams asked to go to the

hospital, but left after an hour because it was crowded and there were too many police there.

(Id.)  He testified that he did not need stitches and the wound healed, but he still has "the mark."

(Id. at 72.)  In his closing argument, Medway argued that the blood on the stairway was evidence

that Williams was wounded the way he said he was.  (Id. at 101-102, 107.)

On cross-examination, Williams explained in greater detail why he came through the

window, and admitted that he was an intruder:

Q.    Well, did you ever crawl through the window before?

A.    Yes.

Q.    Okay, and did you ever crawl through the window with anybody else there?

A.    Yes, her.

. . . .

Q.    So, this is the method of entry you use in your apartment when you're alone, that's what
I'm asking you?

A.    No.

Q.    When you can't get into this apartment, you go in through this window, right?

A.    Well, the situation what happened before is we left our keys at the apartment, rushing out
to go to work, and as we got downstairs, we remembered that, so as we came back
upstairs, the maintenance man had fixed the window and never replaced it, so I told her to
go through the window that way.

Q.    So, she knows that you can come through the window, right?

A.    Yes.

Q.    She knew that night that you did not have a key to her apartment, right?

A.    Yes.

Q.    So, you're saying that you had this prearranged meeting with her, right, at this time, and
she's known before that you had gone through the window, but for some unknown
reason, this night she thinks you're an intruder; is that what you're saying to this jury?

6

A.    Yes.

Q.    You were an intruder, weren't you?

A.    Yes, I was an intruder into her apartment.

(Id. at 64-66.)

The trial judge instructed the jury on possession of an instrument of crime, burglary, first degree murder, second degree murder, third degree murder, and voluntary manslaughter.  (Id. at 132-39.)  The jury convicted Williams of possession of an instrument of crime, burglary, and second degree murder.  (Tr. 5/9/97 at 9-10.)  On October 29, 1998, Williams was sentenced to life for the murder plus a consecutive one to five years for possession of an instrument of crime. (Tr. 10/29/98 at 18.)

Some time after Williams's conviction, an eyewitness, Cynthia Payne, contacted Williams's family.[3]  On February 28, 1999, Williams sent a letter to his appointed counsel on appeal, David Belmont Esq., providing him with Ms. Payne's name and address as a witness to Whittle's death.  (Letter of 2/28/99 from Williams to Belmont, Pet.'s Pro Se PCRA Pet. Ex. A.) On November 15, 2000, Ms. Payne executed a sworn affidavit stating that she had been in the parking lot of Whittle's building on February 9, 1996 and "saw a figure which appeared to be a female backing out onto the balcony.  The woman continued to back up until she fell over the railing." (Pet. for Writ of Habeas Corpus Ex. A.)  In her affidavit, Ms. Payne said that she later found out that someone had been arrested for pushing Whittle over the balcony, "and I know that not to be true from what I saw."  Id.  Ms. Payne asserted that she "would have testified on behalf of the person who was accused of pushing her had [she] been asked to do so."  Id.

_____

[3] Williams provides no exact date for when Ms. Payne approached his family.

7

Williams, represented by Mr. Belmont, filed a timely direct appeal of his conviction and sentence, challenging the sufficiency of the evidence to sustain his conviction for second degree murder, and claiming that his trial counsel was ineffective for failing to interview and call certain witnesses. Mr. Belmont did not identify Ms. Payne as a potential witness. On September 20, 1999, the Superior Court of Pennsylvania affirmed the trial court, noting that the malice required to sustain a second degree murder conviction "can be presumed or inferred from the underlying felony of burglary" and that Williams did not argue that the evidence was insufficient to convict him of the underlying burglary. The court found that Williams's ineffective assistance claim failed because he did not identify a witness or subject of witness testimony, or how the failure to call witnesses prejudiced Williams. Commonwealth v. Williams, 747 A.2d 422 (Pa. Super. 1999). Williams filed a timely request for discretionary review, but the Pennsylvania Supreme Court denied allocatur on February 11, 2000. Commonwealth v. Williams, 751 A.2d 190 (Pa. 2000).

On January 12, 2001, Williams filed his first pro se petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. §§ 9541-51. Judge Greenspan appointed David S. Rudenstein, Esq. counsel and allowed him to file an amended petition on behalf of Williams on June 29, 2001. In his amended petition, Williams claimed that he was entitled to PCRA relief because of:

1.    Ineffective assistance of appellate counsel for failing to challenge the sufficiency of evidence to sustain a guilty verdict on the burglary and second degree murder charges;

2.    Ineffective assistance of appellate counsel for failing to interview eyewitness Cynthia Payne, for failing to brief the issue of whether trial counsel was ineffective for failing to present Ms. Payne, and for failing to plead Ms. Payne's testimony as after-discovered evidence;

3.    Ineffective assistance of trial counsel for stating on the record that he would refuse to protect Williams's rights in filing an appeal and for failing to file a post-trial motion challenging the weight of the evidence as was necessary to preserve Williams's right to challenge the weight of the evidence on direct appeal, and ineffective assistance of appellate counsel for failing to raise the ineffectiveness of trial counsel in failing to file a post-trial motion; and

4.    Ineffective assistance of trial counsel for failing to object to erroneous jury instructions on burglary, and ineffective assistance of appellate counsel for failing to raise and brief that issue.

Judge Greenspan found that Williams had previously litigated the first and second claims.[4]

Judge Greenspan reached the merits of Williams's claims that trial and appellate counsel were ineffective in failing to object to an erroneous jury charge on burglary and in failing to challenge the weight of the evidence, and found that counsel were not ineffective.  On November 9, 2001, Judge Greenspan denied the petition without a hearing.

Williams filed a timely appeal of the PCRA decision in the Superior Court, raising three allegations of error, "all couched in terms of ineffective assistance of counsel":

1.    The evidence at trial was insufficient to support the verdict and all prior counsel were ineffective for failing to put the issue squarely before the court;

2.    Prior counsel failed to assert in post-trial motions and on appeal that the verdicts were against the weight of the evidence; and

3.    Trial and appellate counsel were ineffective for failing to object to an improper jury instruction on the burglary charge.[5]

The Superior Court found that Williams's claims about the sufficiency of the evidence were

---

[4] Commonwealth v. Williams, CP No. 9604-0181, Opinion and Order by Court of Common Pleas of Philadelphia County Judge Jane Cutler Greenspan (Nov. 9, 2001).

[5] Williams does not make any arguments about the burglary charge in his petition for federal habeas relief.

previously litigated[6]; that the verdicts were not against the weight of the evidence and therefore his counsel was not ineffective for failing to claim that they were; and that the trial court's jury instruction on burglary was accurate and proper and thus his counsel was not ineffective for failing to object to it.   The Superior Court affirmed the PCRA Court's decision on August 28, 2002.  Commonwealth v. Williams, 3477 EDA 2001 (Pa. Super. 2002).  Williams did not seek review in the Pennsylvania Supreme Court.

Williams filed his first petition for federal habeas corpus relief in the Middle District of Pennsylvania.  His petition was dated August 28, 2002, but was not received by the court until February 3, 2003.  In a letter to his current attorney Mark E. Cedrone, Esq., and submitted to the court as proof of timeliness, Williams states that he gave his petition to prison guards on January 26, 2003, and that it may have been delayed because he was on a special unit at S.C.I. Albion.  (Pet.'s Obj. to R. & R. Ex. B.)  The case was transferred to the Eastern District for consideration on January 27, 2004, and docketed as Civil Action 04-536.  On February 10, 2004, Judge Hutton ordered the Clerk of Court to give Williams the proper forms to file a habeas corpus petition, and allowed Williams thirty days to submit his petition on the proper forms.  When Williams had not responded by April 5, 2004, Judge Hutton dismissed the petition without prejudice.  On September 9, 2004, Williams filed a motion to vacate the dismissal order, arguing that his petition should be transferred to the United States District Court for the Western District of Pennsylvania.  On October 21, 2004, Judge Hutton denied the motion because Williams had not

---

[6] In fact, the Superior Court had expressly noted that Williams did not argue in his direct appeal that the evidence was insufficient to convict him of the underlying burglary charge.  The implications of the Pennsylvania courts' failure to address the sufficiency of the evidence on the burglary charge on the basis that it was previously litigated, despite noting that it was not litigated, is discussed in section II.B of this memorandum.

yet filed his petition on the proper forms.

Meanwhile, on September 21, 2004, Williams filed a petition for habeas corpus in the Western District of Pennsylvania. On December 3, 2004, the case was transferred to the Eastern District and assigned to Judge Hutton as civil action 04-5619. Again, Judge Hutton directed the Clerk of Court to give Williams the proper forms for filing a habeas petition and allowed Williams thirty days to submit his petition and filing fee. On February 7, 2005, Williams submitted his petition, but Judge Hutton dismissed it on February 14, 2005 because the filing fee had not been received. On March 7, 2005, the Court received Williams's filing fee and Judge Hutton reopened the case for all purposes on April 1, 2005.[7]

In his <u>pro se</u> habeas petition, Williams claims three grounds for relief:

1. That trial counsel was constitutionally ineffective for failing to challenge the sufficiency of the evidence for the burglary charge;

2. That trial counsel was constitutionally ineffective for refusing to introduce evidence that would have established Whittle's and Williams's "confusion, mistaken identity, justifiable mistake, over reaction and excited stress"; and

3. That post-trial counsel was constitutionally ineffective for failing to properly present the after-discovered evidence of Cynthia Payne's testimony.

(Pet. for Habeas Corpus at 9.)


II.    **DISCUSSION**

A.    <u>**Statute of Limitations**</u>

Under the Antiterrorism and Effective Death Penalty Act of 1996, ("AEDPA"), there is a one-year limitations period for federal habeas corpus petitions. 28 U.S.C. § 2244(d). The period

---

[7] This case was transferred to my docket from Judge Hutton's on April 12, 2006.

runs from the date when the judgment becomes final in the state courts and is only tolled by a

properly filed PCRA petition.  Id. § 2244(d)(1)(A) and (d)(2).  Williams's conviction became

final when his time for seeking certiorari on his direct appeal in the United States Supreme Court

expired on May 12, 2000, ninety days after the Supreme Court of Pennsylvania denied allocatur.

An application for PCRA relief is "'properly filed' when its delivery and acceptance are

in compliance with the applicable laws and rules governing filings."  Artuz v. Bennett, 531 U.S.

4, 8 (2000).  Pennsylvania follows a prison mailbox rule, deeming the filing date for pro se

petitions to be when the prisoner gives the petition to prison authorities or places it in a prison

mailbox.  Commonwealth v. Little, 716 A.2d 1287, 1289 (Pa. Super. 1998).  The Pennsylvania

Supreme Court has ruled that "any reasonably verifiable evidence of the date that the prisoner

deposits the appeal with the prison authorities" is acceptable.  Commonwealth v. Jones, 700 A.2d

423, 426 (Pa. 1997).  Although Williams did not date his PCRA petition itself, he certified that

he deposited it in the mail on January 4, 2001, 237 days after his conviction became final.  Under

the mailbox rule and according to Williams's certification of mailing, the remainder of the one-

year period for filing a federal habeas corpus petition under AEDPA was tolled as of that date,

although the petition was not received by the PCRA court until January 12, 2001.[8]

The remaining 128 days in Williams's one-year period began to run on September 27,

2002, when the time for appealing the Superior Court's denial of his PCRA petition expired.  See

Swartz v. Meyers, 204 F.3d 417 (3d Cir. 2000) (holding that the time between the Pennsylvania

---

[8] The respondent's brief and the R&R began the tolling for Williams's PCRA petition on January 12, 2001, when his petition was received by the PCRA court.  Therefore the R&R found the last day for Williams to file a claim to be January 26, 2003.  The R&R did not discuss the application of the mailbox rule to the tolling period.

Superior Court's ruling on a PCRA petition and the deadline for filing a timely request for allowance of appeal to the Pennsylvania Supreme Court tolls the federal habeas limitations period); Douglas v. Horn, 359 F.3d 257 (3d Cir. 2004) (noting that petitioner's PCRA petition tolled the limitations period until the last day that he could have appealed its denial to the Pennsylvania Supreme Court). Therefore the last day for Williams to file his federal habeas petition was Monday, February 3, 2003.[9]

The federal courts also utilize the mailbox rule, "accept[ing] the date that the prisoner delivers his legal filing to prison authorities for mailing as the date of filing." Harris v. Vaughn, 129 Fed. Appx. 684, 687 n.8 (3d Cir. 2005) (citing Houston v. Lack, 487 U.S. 266, 275 (1988)). Williams dated his federal habeas petition August 28, 2002, and it was marked received and filed in the Middle District of Pennsylvania on February 3, 2003. The R&R found the petition untimely because it considered the limitations period to have run on January 26, 2003. The R&R properly noted that Williams could not have submitted his petition to prison officials on August 28, 2002, because that was the same day the Superior Court issued its opinion denying his PCRA appeal, and it was over five months before the petition was received in federal court. Without any more evidence of when the petition was submitted, the R&R considered it submitted when it was received.

Williams objected to the R&R's finding of untimeliness by submitting a letter in which he told his lawyer that he gave his petition to prison guards on January 26, 2003. (Pet.'s Obj. Ex. B.) I find this letter to be relevant evidence under the mailbox rule. It supports a finding that

---

[9] The final day of the one-year period actually fell on Sunday, February 2, 2003. Under Federal Rule of Civil Procedure 6(a), however, if the last day of a period falls on a Sunday, the period runs until the end of the next non-weekend day, in this case Monday, February 3, 2003.

Williams submitted his federal habeas petition on January 26, 2003, within the one year period that expired on February 3, 2003.[10]   A hearing to conclusively establish the issue of timeliness is unnecessary because I find below that Williams's claims all fail on exhaustion and procedural default grounds or on the merits.   Assuming that Williams's petition is timely,[11] I proceed with my analysis of his claims for relief.


B.      **Exhaustion and Procedural Default**

Williams presents three claims in his petition for federal habeas relief.   A petitioner in state prison "must exhaust his state court remedies before a federal court may grant him habeas relief."   Lambert v. Blackwell, 387 F.3d 210, 231 (3d Cir. 2004).   "Section 2254(c) requires only that state prisoners give state courts a *fair* opportunity to act on their claims."   Id. at 232 (quoting Wilwording v. Swenson, 404 U.S. 249, 249-50 (1971).   "Even if a state court fails to rule on the merits of a claim, a properly presented claim will be considered exhausted."   Johnson v. Pinchak, 392 F.3d 551, 556 (3d Cir. 2004).

After examining whether an issue has been exhausted in the state courts, a federal court

---

[10] Even calculating the period for which the PCRA petition tolled the federal period as beginning on the date the PCRA petition was received by the Court of Common Pleas, as the R&R did, Williams's petition would be timely as filed on the last day of the one year period.

[11] Respondent further argues that when petitioner moved to vacate Judge Hutton's original dismissal of his case for failure to file the proper forms and to transfer it to the Western District, his non-compliance with the court's procedural requirements made the current petition untimely.   I find that the procedural confusion does not bar my consideration of this petition for all intents and purposes as the one that was filed in the Middle District on February 3, 2003, and subsequently transferred to the Eastern District.   In a situation like this, where a petitioner "has timely asserted his rights mistakenly in the wrong forum," equitable tolling is appropriate.   See Jones v. Morton, 195 F.3d 153, 159 (3d Cir. 1999).

considering a habeas petition must determine whether any of the federal claims presented have been "procedurally defaulted."  Under the "adequate and independent state ground" doctrine, a federal court is generally barred from adjudicating a federal claim when the state court refused to address the claim due to "an established state rule of law independent of the federal claim and adequate to support the refusal."  Sistrunk v. Vaughn, 96 F.3d 666, 673 (3d Cir. 1996).  In the federal habeas context, when a state court has refused to reach a habeas petitioner's federal claims due to the petitioner's failure to satisfy a state procedural rule, this is generally considered an "adequate and independent state ground" and the petitioner is considered to have "procedurally defaulted" his federal claims.  The consequence is that federal habeas review is foreclosed, unless the petitioner shows "cause" for the default and "prejudice" as a result of the alleged federal violation, or alternatively, the petitioner makes a sufficient showing of actual innocence.  Id. (citing Coleman v. Thompson, 501 U.S. 722, 750 (1991)).

1.    Procedural Default and the PCRA's Bar on Previously Litigated Claims

Sometimes there exists a tension between the federal "procedural default" doctrine and the PCRA's bar on "previously litigated" claims.  The doctrine of procedural default ensures "that the States' interest in correcting their own mistakes is respected in all federal habeas cases" because "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance.  Coleman, 501 U.S. at 731-32.  This rationale does not apply to the

PCRA's bar on "previously litigated" claims, 42 Pa. Cons. Stat. Ann. § 9543(a)(3).[12]  Under the "previously litigated" rule, a PCRA court must refuse to hear a claim where "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue; or...it has been raised and decided in a proceeding collaterally attacking the conviction or sentence."  42 Pa. Cons. Stat. Ann. § 9544(a)(2)-(3).

The PCRA's "previously litigated" rule is not what it appears to be, a state "procedural requirement" within the meaning of Coleman.  When a PCRA court rules that an issue has been previously litigated, either the issue has been raised on direct appeal and thus would not be procedurally defaulted, or it should have been heard by the PCRA court and was not.  In the instant case, the R&R treated the "previously litigated" finding by the Superior Court on PCRA review as a "procedural default" barring federal habeas review.  I do not adopt this approach.  A finding that a PCRA claim is "previously litigated" carries no implication of procedural error on the petitioner's part.  It solely indicates that the petitioner had previously raised the claim, and lost.  Therefore, unlike genuine procedural requirements, such as statutes of limitations or rules governing waiver, the "previously litigated" rule is not one that a petitioner can somehow obey in order to obtain PCRA review of his claim.  Cf. Sistrunk, 96 F.3d at 673-75 (petitioner procedurally defaulted claim for purposes of federal habeas review by failing to first raise his Batson claim on direct appeal).[13]  Because the "previously litigated" rule is not a procedural

---

[12] I first discussed this issue at length in my earlier opinion Alford v. Johnson, 2006 WL 516768 (E.D. Pa. 2006).

[13] Although Sistrunk may appear at first glance to apply to Williams's case, it does not, due to the amendments to the PCRA since Sistrunk was decided.  Under the version of the statute in effect at the time of Sistrunk, a claim was considered "previously litigated" both if it had been fully litigated all the way to appeal and if it had been litigated in the trial court but *not* appealed.

16

requirement, it does not trigger the procedural default doctrine on habeas review.

Treating a "previously litigated" finding by a PCRA court as an affirmance of the underlying state court ruling accords fully with the policy and purpose of the procedural default doctrine. As the Third Circuit noted in <u>Sistrunk</u>, the procedural default doctrine, like the exhaustion of state remedies doctrine, is

> designed to assure that the highest court of a state will have the opportunity to address the federal claim in the first instance.... [I]n a situation where...[PCRA] collateral review is barred...because the claim has been fully litigated and rejected on direct review[,] the petitioner will have exhausted state remedies and the state appellate courts will have had the required opportunity to address the federal claim.

96 F.3d at 675 n. 11. Where the "previously litigated" rule has barred PCRA review, there need not be any concern about intruding upon the state courts, because the state court was given and decided to pass upon its opportunity to hear the claim.

In <u>Villot v. Varner</u>, 373 F.3d 327 (3d Cir. 2004), the Third Circuit rejected the state's argument that an "innocence requirement" to obtain collateral relief from a guilty plea was a procedural requirement whose "violation" led to procedural default on habeas review. The Third Circuit reasoned that the state had "forfeited its opportunity to consider the federal claims of the class of petitioners who cannot satisfy the additional state-created substantive requirement" and that "[t]he considerations of comity and federalism underlying the procedural default rule have no application in such cases." 373 F.3d at 334. The Pennsylvania legislature's choice to limit PCRA review to novel claims, like the choice to limit review of guilty plea claims to those where a showing of innocence is made, may be properly considered the state's own forfeiture of its

---

In 1995, the state legislature amended the statute to indicate that the latter situation, where defendant raised a claim in the trial court and failed to appeal the adverse ruling, would be considered "waiver," not "previously litigated." <u>See</u> 42 Pa. Cons. Stat. Ann. § 9543(b) (1995).

opportunity to hear the claims falling outside this requirement.  Therefore, as in <u>Villot</u>, allowing federal habeas review of claims barred by the PCRA's "previously litigated" rule implicates no comity or federalism concerns.

Thus, where the Superior Court found Williams's claims to be "previously litigated" (as discussed more fully below), those claims are not procedurally defaulted for the purpose of federal habeas review, and the R&R's finding to the contrary is improper.

2.    <u>Ineffective Assistance in Challenging the Sufficiency of the Evidence to Support Burglary</u>

Williams's first claim is that trial counsel was constitutionally ineffective for failing to challenge the sufficiency of the evidence on the burglary charge.  The Superior Court noted that Williams did not raise this issue on direct appeal.[14]  The claim of ineffective assistance of counsel in challenging the sufficiency of evidence on burglary was, however, fairly presented to the state courts through Williams's PCRA petition, although the courts refused to consider the claim based on the "previously litigated" rule.  Despite the Superior Court's finding on direct appeal that Williams had not challenged the sufficiency of the evidence to support burglary, the PCRA judge wrote that "it is indisputable that the merits of these arguments [that appellate counsel was ineffective for failing to challenge the sufficiency of the evidence to sustain burglary] were considered and subsequently denied on direct appeal to the Pennsylvania Supreme

---

[14] The Superior Court wrote that "Appellant does not argue that evidence was insufficient to convict him of the underlying burglary."  Mem. Op. of the Sup. Ct., No. 3455 PHL 1998 (Sept. 20, 1999).

Court."[15]  Commonwealth v. Williams, CP No. 9604-0181, Opinion and Order of 11/9/01 (J. Greenspan).  Therefore the judge denied Williams's claim for PCRA relief on this issue, and the Superior Court affirmed the denial.  Because the claim was presented in both levels of Williams's PCRA proceeding, it is exhausted.

As discussed above, the state courts' application of the "previously litigated" bar to consideration of Williams's claim does not make the claim procedurally defaulted for the purposes of federal habeas review.  The state courts were presented with an opportunity to consider the claim and declined it.  Therefore Williams's claim that his counsel was constitutionally ineffective for not failing to argue the insufficiency of evidence to support the burglary conviction is exhausted and is not procedurally defaulted.  This issue will be considered on the merits below.

3.    Ineffective Assistance for Failing to Introduce Evidence of Confusion and Mistake

Williams's second claim, that trial counsel was constitutionally ineffective for failing to investigate and introduce evidence that would have established Whittle's and Williams's

---

[15] At the time of Williams's PCRA petition, the Pennsylvania Courts held that ineffective assistance claims were merely "alternative theories" in support of the underlying substantive issue.  See, e.g., Commonwealth v. Peterkin, 649 A.2d 121 (Pa. 1994); Commonwealth v. Christy, 656 A.2d 877 (Pa. 1995); Commonwealth v. Travaglia, 661 A.2d 352 (Pa. 1995).  In 2005, the Pennsylvania Supreme Court noted that this approach "was...employed in a way that claims of trial counsel ineffectiveness that were based on an issue that was raised on direct appeal were precluded as 'previously litigated' [on collateral attack]; and the merit of the claim relating to counsel's conduct and the adequacy of his representation were never examined." Commonwealth v. Collins, 888 A.2d 564, 571 (Pa. 2005).  In Collins, the Pennsylvania Supreme Court finally rejected this line of cases.  The court recognized that ineffective assistance claims are analytically distinct from an underlying substantive claim that counsel allegedly ineffectively failed to prove, and should be treated separately on collateral review.  See id. at 572-73; Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).

"confusion, mistaken identity, justifiable mistake, over reaction and excited stress," is

unexhausted.  In his brief, Williams explains that he is claiming his counsel failed to present and

argue facts about the darkness and likelihood of confusion, to minimize Whittle's puncture

wounds and explain her aggression towards him, and to introduce evidence of Williams's blood

to show that he was assaulted first.[16]  Except as they relate to trial counsel's failure to argue the

sufficiency of the evidence to support Williams's burglary conviction, these claims were never

presented to the state courts, either on direct appeal or through PCRA petition.  Therefore they

were not exhausted.

At this point, there is no way for Williams to present such a claim in the state courts

because any new PCRA petition would be untimely, and the claim would be waived.  See 42 Pa.

Cons. Stat. Ann. § 9545(b)(1) (petition for PCRA relief must be filed within one year of the date

the conviction becomes final); 42 Pa. Cons. Stat. Ann. § 9544(b) (PCRA Court will not hear a

claim that could have been brought in an earlier proceeding).  Thus the magistrate correctly

found the claim procedurally defaulted.  Williams did not explain his failure to make these

claims, so there is no basis upon which to find cause and prejudice to excuse such a failure.

In his objections to the R&R, Williams argues that any procedural default of his claims

should be excused because it "will result in a fundamental miscarriage of justice because [he] is

innocent."  (Pet.'s Obj. to R&R at 3.)  To support excusing procedural default on the basis of

averting fundamental injustice, Williams must demonstrate that newly discovered evidence

---

[16] At trial, on direct examination by the prosecution, Criminal Evidence Specialist
Richard Henderson showed the jury photos of two red stains on the stairwell at the second floor.
(Tr. 5/6/97 at 36-37.)  He testified that samples of the blood were submitted to the crime lab for
blood typing, but the amount was insufficient to determine type.  (Id. at 45.)

makes it "more likely than not that no reasonable juror would have convicted him in light of the new evidence." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup v. Delo, 513 U.S. 298, 326 (1995)); see also Werts v. Vaughn, 228 F.3d 178, 193 (3d Cir. 2000). Williams claims that the affidavit of Ms. Payne, which he has attached to his habeas petition, establishes his innocence according to this standard. I find that it does not.

Ms. Payne's affidavit is consistent with Williams's testimony at trial, and does not disprove any element of the crimes that Williams was convicted of. According to the affidavit, Ms. Payne saw a woman back out of an apartment onto a balcony until she fell over the railing. Moments later, she saw a man come onto the balcony and look over the railing, and then leave. (Payne Affidavit.) At trial, Williams himself admitted that after he stabbed Whittle with the steak fork "a couple of times," she ran from him onto the balcony. (Trans. 7/8/97 at 30.) He testified that as Whittle backed up, saying, "No, no," she "fell off the railing." (Id. at 32.)

As the magistrate noted in the R&R, Payne's affidavit and Williams's testimony, while consistent with each other, are also consistent with his conviction for felony murder. Under the felony murder doctrine, "the malice necessary to make a killing, even an accidental one...is constructively inferred from the malice incident to the perpetration of the initial felony." Commonwealth ex rel. Smith v. Myers, 261 A.2d 550, 553 (Pa. 1970). "The legal cause of death is thus sufficiently proven if the criminal behavior is shown to have been a direct and substantial factor in bringing about the death." Commonwealth v. Evans, 494 A.2d 383, 389 (Pa. Super. 1985)(sustaining conviction of second-degree murder in case where victim died of cardiac arrest four hours after being kidnaped and robbed by petitioner). Here, Williams was convicted of burglary at trial. He testified that he entered Whittle's apartment after she told him not to enter.

21

(Tr. 5/8/97 at 29-30.)  He stabbed her several times and then pursued her to the balcony, where she fell to her death.  (Id. at 32-34.)

As discussed below, this evidence is sufficient to support a conviction of burglary.  The causal connection between Williams entering the apartment and Whittle's death is considerably closer than that upheld in Evans, and supports a conviction of felony murder based on the burglary.  Payne's affidavit only bolsters Williams's testimony that he did not push Whittle over the balcony, an issue immaterial to these convictions.  In light of its irrelevance, the affidavit does not provide proof of actual innocence, and I cannot find that "no reasonable juror would have convicted him in light of the new evidence." Calderon, 523 U.S. at 559.  Thus the affidavit does not excuse any procedural default for fundamental miscarriage of justice.  Williams's second claim is procedurally defaulted.


4.    Ineffective Assistance of Appellate Counsel for Failing to Present Ms. Payne's Testimony

The third claim presented in this habeas petition is that counsel on direct appeal was constitutionally ineffective in failing to present the after-discovered evidence of Cynthia Payne's testimony.  This claim obviously could not have been raised on direct appeal, as it relates to the ineffectiveness of appellate counsel's performance.  Williams presented this claim to the PCRA court, which dismissed it as previously litigated, but abandoned it in his collateral appeal.  He fails to explain why he abandoned this claim, and any attempt to allege the ineffectiveness of collateral appellate counsel as cause for the default would fail because that claim itself is unexhausted and Williams had no constitutional right to counsel on collateral appeal.  See Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000)(only ineffective assistance of counsel of

22

constitutional magnitude can excuse a default, and such claim must itself be exhausted).  As discussed above, Ms. Payne's affidavit does not provide proof of actual innocence.  Williams is unable to rely on it to make a showing of fundamental injustice that would excuse his procedural default, and the claim is defaulted.

C.    **The Alleged Ineffectiveness of Trial Counsel for Failing to Challenge the Sufficiency of the Evidence for the Burglary Charge**

Williams's sole claim to have been exhausted and not procedurally defaulted is his first: that his trial counsel was constitutionally ineffective for failing to challenge the sufficiency of the evidence presented at trial to support his conviction for burglary.[17]  Claims of ineffective assistance are analyzed under the two-part test articulated in Strickland v. Washington, 466 U.S. 668 (1984).  In order to merit habeas relief due to the ineffectiveness of counsel, petitioner must establish that (1) counsel's performance fell well below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome of the proceeding.  Id. at 687.  Counsel is presumed to be effective

---

[17]  Williams characterizes his claim as ineffectiveness "for failing and refusing to properly demonstrate, articulate, object and remonstrate at trial that the allegation of 'Burglary' was never made out at trial." Pet. Hab. Corp. at 9.  In this memorandum I assume that Williams is challenging the sufficiency of the evidence, and find that his counsel was not constitutionally ineffective in failing to challenge the sufficiency of the evidence.  To the extent that Williams is also claiming that his counsel should have filed a motion challenging the weight of the evidence in addition to the sufficiency of the evidence, he also fails to meet that standard.

A defendant is entitled to a new trial on the basis that the verdict is against the weight of the evidence only where the verdict shocks one's sense of justice.  See Commonwealth v. Laing, 456 A.2d 204 (Pa. 1983); Commonwealth v. Bellini, 482 A.2d 997 (Pa. Super. 1984).  The same evidence that compels my finding of sufficient evidence to support the burglary conviction in this case prevents the verdict from shocking one's sense of justice.  Therefore any argument that Williams's counsel was constitutionally ineffective in failing to challenge the weight of the evidence also must fail.

and petitioner bears the burden of "overcom[ing] the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 686-89. Where counsel failed to raise a meritless claim, relief under Strickland is not available. Id. at 691. Because the state courts never reached this claim on the merits, finding that it was not raised on direct appeal, yet rejecting it as previously litigated on collateral appeal, my review of counsel's alleged ineffectiveness under Strickland is de novo. Wiggins v. Smith, 539 U.S. 510, 534 (2003).

1.    Performance

         To establish deficient performance under the first prong of Strickland, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. The reasonableness of counsel's conduct must be determined on the facts of the particular case, viewed as of the time of counsel's conduct and "in light of all the circumstances." Id. at 689-90; see also Jacobs v. Horn, 395 F.3d 92, 106 (3d Cir. 2005). Counsel's actions must be viewed in light of applicable state law because reasonably competent counsel is required to know the state of the applicable law. Everett v. Beard, 290 F.3d 500, 509 (3d Cir. 2002).

         Williams argues that his trial counsel was constitutionally ineffective "for failing and refusing to properly demonstrate, articulate, object and remonstrate at trial that the allegation of 'Burglary' was never made out at trial." (Pet. Hab. Corp. ¶12(a).) When reviewing a sufficiency challenge, Pennsylvania courts "must determine whether the evidence, and all inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all the elements of the crime(s) beyond a reasonable doubt."

Commonwealth v. McCullum, 602 A.2d 313, 316 (Pa. 1992).  To sufficiently make out the crime

of burglary at trial, the Commonwealth was required to prove, beyond a reasonable doubt, that

Williams (1) entered Whittle's apartment (2) with intent to commit a crime therein, unless he

was licensed or privileged to enter.[18]  See 18 Pa. Cons. Stat. Ann. § 3502.

Williams's own testimony supports the first element of burglary, and belies his argument

that he was licensed or privileged to enter.  By Williams's own admission, he entered Whittle's

apartment through the window.  (Tr. 5/8/97 at 29.)  Williams testified that he heard Whittle say

"Don't come in here" as he entered through the window, and that she stabbed him.  (Id.)  On

cross-examination Williams stated "Yes, I was an intruder into her apartment."  (Tr. 5/8/97 at

66.)  On the basis of Williams's testimony alone, the jury had sufficient evidence to find that he

was not licensed or privileged to enter Whittle's apartment through the window at that time.

There was also sufficient evidence to support the jury's finding that Williams intended to

commit a crime at the time he entered Whittle's apartment.  The intent to commit a crime upon

entry necessary to support a burglary conviction may be inferred from the surrounding

circumstances.  Commonwealth v. Alston, 651 A.2d 1092, 1094 (Pa. 1994).  Once a defendant

"has entered a private residence by criminal means we can infer that [he] intended a criminal

purpose based upon the totality of the circumstances."  Id. at 1095.  The prosecution "is not

required to allege or prove what particular crime [he] intended to commit after his forcible entry

into the private residence."  Id.  In this case, the jury would have sufficient evidence to find

---

[18] Williams's second-degree murder conviction also depends on the sufficiency of the
evidence to support burglary, the underlying felony.  In Pennsylvania, second degree murder is
defined exclusively as a criminal homicide "committed while defendant was engaged as a
principal or an accomplice in the perpetration of a felony."  18 Pa. Cons. Stat. Ann. § 2502(b).

Williams guilty of burglary if the totality of the circumstances supported an inference that Williams entered the apartment intending to commit any crime against Whittle.

Sufficient evidence was introduced at trial to support beyond a reasonable doubt the inference that Williams entered the apartment intending to harm or threaten Whittle. Anessia testified that she was staying with Whittle because Whittle was afraid of Williams and did not want to be home alone. (Tr. 5/6/97 at 74.) She testified that both she and her sister told Williams to get out of the apartment, but that he did not leave until after Whittle fell to her death. (Id. at 79-86.) Anessia testified that Williams moved toward her holding a two-pronged fork at her eye level. (Id. at 82.) She saw Williams and Whittle "in a real tight bundle" with Whittle leaning against the metal railing on the balcony, and heard Whittle say "No, no." (Id. at 84-85.) The Assistant Medical Examiner testified that Whittle sustained three pairs of puncture wounds on or near her left shoulder, ranging from one-half inch deep to one and a quarter inches deep. (Tr. 5/7/97 at 49-51.) Pennsylvania courts have on many occasions found similar evidence sufficient to infer the intent necessary to support a conviction for burglary.[19] This evidence was

---

[19] See e.g. Commonwealth v. Ford, 650 A.2d 433, 438 (Pa. 1994)(the condition of the victim's body and her state of undress provided sufficient evidence); Commonwealth v. Kennedy, 453 A.2d 927, 929 (Pa. 1982)(defendant's participation in an assault after entry combined with a preexisting animosity toward the victim was sufficient); Commonwealth v. Lambert, 795 A.2d 1010, 1022 (Pa. Super. 2002)(sufficient evidence where defendant entered residence without license or privilege by shattering door and door frame and then caused the death of two people); Commonwealth v. Magnum, 654 A.2d 1146, 1147-48 (Pa. Super. 1995)(evidence that defendant threatened his ex-girlfriend and her current boyfriend after breaking into her house was sufficient); Commonwealth v. Eck, 654 A.2d 1104, 1108-09 (Pa. Super. 1995)(sufficient evidence where defendant had previously stated that he hated one victim, and where he helped himself to food and other household items of the other after breaking into her house); Commonwealth v. Russell, 460 A.2d 316, 318 (Pa. Super. 1983)(sufficient evidence when defendant struggled with victim as she attempted to keep him from entering the door he had forced open and brought twine, tape and knife, although he claimed he merely wanted to talk to her and get to know her better); Commonwealth v. Simpson, 462 A.2d 821, 824-25 (Pa. Super.

sufficient to find that Williams intended to commit a crime upon entry through the window.

Although Williams offered a different account of his intention in entering the apartment, the jury was entitled to disbelieve him and accept other inferences from the evidence presented to them.  Under Pennsylvania law, the credibility of witnesses "is solely within the province of the finder of fact which is free to believe all, part or none of the evidence."  Commonwealth v. Murray, 597 A.2d 111, 114 (1991); see also Commonwealth v. Neal, 290 A.2d 922, 924 (Pa. 1972).  Williams testified that he called Whittle the evening of her death and made plans to drop off her key later that night.  (Tr. 5/8/97 at 26-27.)  He testified that when there was no answer at her door, he went around to the kitchen window, knocked, opened it, and yelled that he had come to give her the key.  (Id. at 28.)  Williams explained his stabbing of Whittle as an angry response to her stabbing him in the leg as he entered.  (Id. at 33-34.)  This version of events could easily be considered implausible, based on Anessia's testimony that Whittle was afraid of Williams and Williams's own testimony that Whittle attempted to keep him out of the apartment, which was inconsistent with his testimony that they had arranged to meet in her apartment that night.  In any event, the question for a habeas court in reviewing challenges to the sufficiency of the evidence is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Sullivan v. Cuyler, 723 F.2d 1077, 1083-84 (3d Cir. 1983)(quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979))(emphasis in original).  The jury had sufficient evidence to disbelieve Williams and find that he intended to harm or threaten Whittle upon entry.

---

1983)(evidence that defendant applied pressure to victim's throat and began to remove his pants after breaking into house and entering victim's room was sufficient).

Because the jury had sufficient evidence to find that Williams committed burglary, his trial counsel cannot be deemed ineffective for failing to make a motion based on any alleged insufficiency of the evidence. The Third Circuit has held that trial counsel is not ineffective for failing to make objections or motions that are not supported by the evidence. See Moore v. Deputy Comm'rs of SCI-Huntingdon, 946 F.2d 236, 245 (3d Cir. 1991); Parrish v. Fulcomer, 150 F.3d 326, 327 (3d Cir. 1998). The evidence presented to the jury was somewhat conflicting, but for purposes of sufficiency it must be taken in the light most favorable to the government. Under the circumstances, it was not unreasonable for Williams's trial counsel not to challenge the sufficiency of the evidence. Therefore Williams's claim that his trial counsel was constitutionally ineffective for not challenging the sufficiency of the evidence must fail.[20]

## III.    CONCLUSION

Two claims in Williams's petition for habeas corpus are unexhausted and procedurally defaulted, and Williams cannot show cause and prejudice or proof of actual innocence to excuse the default. The sole claim presented that has been exhausted and not procedurally defaulted is

---

[20] It is not necessary to reach the second prong of Strickland because Williams failed to establish the first prong, that counsel's performance fell well below an objective standard of reasonableness. Even if trial counsel's performance *was* found unreasonable, Williams would not be able to meet the second prong. To do so he would have to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Wiggins, 539 U.S. at 534. Although a "reasonable probability" is less demanding than a "preponderance of the evidence" standard, Williams would still be unable to show that a motion for dismissal or a directed verdict on the basis of the insufficiency of the evidence would have been reasonably likely to have succeeded and thus changed the outcome of the trial. Given the case law on the sufficiency of the evidence for burglary in Pennsylvania in similar cases, and the ample evidence in this case, the trial judge would have been very unlikely to grant to such a motion.

that trial counsel was ineffective in failing to challenge the sufficiency of the evidence for the burglary conviction.  This claim fails on the merits.  Therefore Williams is not entitled to habeas corpus relief from his convictions for second-degree murder, burglary, and possession of an instrument of crime.  Williams has not made a substantial showing of the denial of a constitutional right requiring the issuance of a certificate of appealability.  An appropriate order follows.

**ORDER**

**AND NOW**, this ___7th____ day of June 2006, upon consideration of the parties' filings including petitioner's objections, and after careful review of the Report and Recommendation of the United States Magistrate Judge, it is **ORDERED** that:

1.    The Clerk's Office shall remove this case from civil suspense.

2.    The Report and Recommendation (Docket #21) is **APPROVED** as to its recommendation to deny the petition.  The approval of the R&R is subject to the conclusions as set forth in the accompanying memorandum.

3.    The petition for a writ of habeas corpus is **DENIED**.

4.    There is no basis for the issuance of a certificate of appealability.


_____

ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:        Copies **MAILED** on _____ to:

30

O:\ABB 2006\Mitchell Williams habeas memo.wpd